**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br><br> DEXCOM, INC., <br> Defendant. | Case No.: <br><br><br><br> **COMPLAINT** |

Plaintiff United HealthCare Services, Inc. brings the following Complaint for injunctive relief, declaratory judgment, specific performance, and money damages against Defendant DexCom, Inc.

### The Parties

1. Plaintiff United HealthCare Services, Inc. ("UHS") is a Minnesota corporation with a principal place of business at 9900 Bren Road East, Minnetonka, Minnesota.

2. Defendant DexCom, Inc. ("DexCom") is a Delaware corporation with a principal place of business at 6340 Sequence Drive, San Diego, California.

## Jurisdiction and Venue

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between UHS and DexCom, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     This Court also has subject matter jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, because an immediate and substantial controversy exists between UHS and DexCom.

5.     This Court has personal jurisdiction over DexCom under the Minnesota Long Arm Statute, Minn. Stat. § 543.19, because DexCom transacts business within Minnesota and has committed acts both within and outside Minnesota that have caused injury in Minnesota.

6.     This Court additionally has personal jurisdiction over DexCom because DexCom consented to submit to the jurisdiction of this Court by agreeing in the parties' Product Purchase Agreement that claims for injunctive relief and specific enforcement of the Agreement may be brought in any federal or state court having subject matter jurisdiction.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.  Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(3) because DexCom is subject to personal jurisdiction in this district.

## Factual Allegations

**A.    UHS's Level2 Type 2 Diabetes Management Program**

8.    UHS is a health insurance and managed care service provider.  As part of its business, UHS offers employer-sponsored insurance plans for businesses looking to support their employees' health and well-being.

9.    In 2020, and in connection with these plans, UHS, through its affiliate, Level2 Health Management, LLC ("Level2"), launched a first-of-its-kind nationwide digital platform and program to manage care for patients with Type 2 diabetes.

10.    Under the program, Level2 equips each patient with a wearable continuous glucose monitoring ("CGM") device, which continuously reads their glucose levels so patients can monitor and track their glucose level and understand how lifestyle and medication affect their blood sugar.

11.    The manufacturer of the CGM used by the patient also provides Level2 with access to this data, enabling its healthcare professionals to remotely monitor the patient's daily glucose levels, patterns and trends.

12.    By receiving and using the data collected from a patient's CGM device, Level2 healthcare professionals can identify hypoglycemia episodes (unhealthy drops in glucose) and adjust the patient's medical treatment.  Having access to a patient's CGM data also helps Level2 healthcare professionals prevent

or lower the risk of the patient suffering a catastrophic hypoglycemic episode, such as losing consciousness or suffering a seizure while operating a motor vehicle or machinery. With this data, Level2 healthcare professionals can further help a patient understand what impacts their glucose levels, form new habits, and pursue a customized path to remission.

13.    In order for it to operate at scale, Level2 has developed proprietary systems designed to utilize and display a patient's CGM data in ways that are meaningful and streamlined for Level2's healthcare professionals. Additionally, Level2 utilizes the raw data received from the CGM manufacturer to calculate derivative metrics that enable its healthcare professionals to more fully understand an individual's control of their blood glucose, as well as allow patients to more easily understand the variations in their blood glucose levels. Furthermore, Level2 providers document a patients' CGM data, or derivatives thereof, in the patients' medical records.

**B.    The Product Purchase Agreement**

14.    Defendant DexCom makes and sells CGM devices.

15.    In advance of launching Level2, and effective June 1, 2018, UHS entered into a Product Purchase Agreement with DexCom to purchase DexCom's G5 model and G6 model CGM devices at agreed prices. A true and correct copy of the Product Purchase Agreement is attached hereto as **Exhibit 1**.

16.    Under the Product Purchase Agreement, UHS made DexCom its preferred vendor of CGM products for all "UHS Programs."  *See* Ex. 1, § 2.1(A). The Product Purchase Agreement defines "████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████  *See id.*, § 1.1(H).  UHS's Level2 diabetes care program qualifies as an "UHS Program."

17.    In addition to agreeing to supply UHS with CGMs, DexCom further agreed to █████████████████████████████████████████████████████ ████████████████████████████████████████  *See id.*, § 8.5.  The Product Purchase Agreement defines ███████████████████████████████████ ███████████████████"  *See id.*, at Ex. B.

18.    DexCom additionally granted UHS ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████."  *See id.*, § 8.5.

19.     These two provisions are critical to UHS, as they require DexCom to provide Level2 with its patients' CGM Output Data for the duration of the time a Level2 patient uses DexCom's CGMs, and expressly authorize Level2 to use, disclose and distribute the data through its platform to its patients and their respective Level2 healthcare professionals.

20.     The Product Purchase Agreement further provides that ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  *See id.*, § 12.2.

21.     The initial term of the Product Purchase Agreement was for four years, beginning on June 1, 2018 and ending on May 31, 2022, subject to automatic one-year renewals, unless either party terminated the Product Purchase Agreement by delivering a termination notice at least 60 days prior to the end of the initial term or the applicable renewal term.  *See id.*, § 7(A).

**C.     DexCom Repudiates Its Obligation to Provide CGM Data to UHS.**

22.     After the initial four-year term expired, the parties allowed the Product Purchase Agreement to automatically renew on June 1, 2022 and again on June 1, 2023 for one-year terms.

23.     From its inception, UHS's Level2 diabetes management program has relied on DexCom to supply CGM devices.  In fact, since mid-2020, UHS has purchased more than $38 million in CGMs from DexCom at prices agreed upon in the Product Purchase Agreement.

24.     DexCom has always provided UHS with the CGM Output Data transmitted from  patients' G5 and G6 CGMs by having UHS access the data through DexCom's Application Programming Interface ("API").  As such, UHS's Level2 program has run as intended, with patients and their Level2 healthcare professionals having access to daily glucose levels, patterns and trends through Level2's platform.

25.     In July of 2022, UHS sought to amend the scope of the Product Purchase Agreement to include DexCom's newest CGM device, the DexCom G7.

26.     After several rounds of negotiation focused on price, in September of 2023 DexCom abruptly changed course and insisted that UHS execute a one-sided DexCom Developer Agreement, which it requires when software companies seek to develop computer programs and mobile apps based on data provided by a

DexCom's API.  Moreover, DexCom demanded that UHS convey ownership of its own intellectual property to DexCom and execute a non-competition agreement.

27.    These demands were inconsistent with the terms of the existing Product Purchase Agreement and would not allow UHS to maintain its current patient care through Level2.   Furthermore, the terms of the Developer Agreement were inconsistent with Level2's obligations as a Covered Entity under HIPAA and as an Agent under the 2021 Information Blocking Laws. As such, agreeing to DexCom's terms would cause Level2 to violate state and federal laws it is subject to as a care provider.

28.    On March 20, 2024, after it became clear that UHS would not acquiesce to DexCom's demands, DexCom terminated the Product Purchase Agreement effective June 1, 2024.   A true and accurate copy of DexCom's termination notice is attached hereto as **Exhibit 2**.

29.    Based on DexCom's claim that it owned the data from the CGMs, UHS was concerned that DexCom would not continue to provide the API after the termination date, as required by the Product Purchase Agreement, Section 8.5.  On April 30, 2024, UHS sent DexCom an email asking for confirmation that "DexCom will continue to supply CGM output data following May 30, 2024 in accordance with the terms established in the Product Purchase Agreement dated June 1, 2018."

30.     DexCom responded by letter dated April 30, 2024.  In it, DexCom stated that because the parties were "unable to agree on the terms of a developer agreement," DexCom would only guarantee UHS's access to the API after June 1, 2024 if UHS agreed to a list of conditions set forth in the letter.  A true and accurate copy of DexCom's April 30, 2024 letter is attached hereto as **Exhibit 3**.

31.     The letter further stated that even if UHS agreed to the conditions DexCom would only guarantee UHS's access to the API to September 30, 2024 and that such access, if not shut down earlier, would end on December 31, 2024.  *See* Ex. 3, at 1.

32.     Among the list of conditions, DexCom demanded that UHS expressly acknowledge and agree that:

a.  "DexCom has not granted and does not grant a license to [UHS] to access or retrieve any DexCom data;"

b.  "[UHS] is not granted a license to display any DexCom data through any [UHS] or any third-party device or software or application;" and

c.  "DexCom has not and does not consent to [UHS] sharing or transferring any DexCom data to any third party, whether in identified, de-identified or aggregate form for any purpose."

*See id*.

33.     UHS did not agree to these conditions as they are an attempt by DexCom to withhold performance in order to rewrite the terms of the Product Purchase Agreement.   Indeed, under Section 8.5 of the Purchase Agreement, DexCom is required to provide UHS with the CGM Output Data transmitted from Level2's patients' G5 and G6 CGMs "███████████████████████████ ███████████," including its Level2 diabetes management program.  *See* Ex. 1, § 8.5.   Under the same provision, DexCom granted UHS ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████

*See id.*, § 8.5.

34.     Accordingly, UHS has the right to access and retrieve DexCom data, to display DexCom data through its Level2 platform, and to share such data with Level2's patients and their Care Teams.

35.     UHS responded to DexCom by letter dated May 1, 2024.  In the letter, UHS advised DexCom that the conditions it sought to impose on UHS's access to and use of the CGM data were not acceptable and contrary to the terms of the Product Purchase Agreement.   UHS further sought specific confirmation from DexCom that it "will comply with its contractual obligation and continue to make the API and data available for Level2 without limit of time with respect to [the

CGMs] acquired under the" Product Purchase Agreement prior to May 31, 2024. UHS informed DexCom that if such confirmation was not received by 12:00 p.m. CST on May 3, 2024, it will "take legal action to protect [its] position and to safeguard the health of [its] patients." A true and accurate copy UHS's May 1, 2024 letter is attached hereto as **Exhibit 4**.

36. To date, DexCom's only response to this letter was an acknowledgement of its receipt.

37. DexCom has repudiated its obligation under Section 8.5 of the Product Purchase Agreement to provide CGM Output Data to UHS "████ ███████████████████████████████████ m." *See* Ex. 1, § 8.5. Since the inception of the Product Purchase Agreement, DexCom has allowed UHS to access the data through the API. However, DexCom has unequivocally informed UHS that its access to the API after June 1, 2024 is contingent upon it agreeing to a list of conditions not contained in the Product Purchase Agreement. Even if UHS were to agree to these conditions, DexCom has further told UHS that its access to the API is guaranteed only until September 30, 2024 and that such access, if not shut down earlier, ends on December 31, 2024. DexCom additionally has not identified any alternative method for complying with its obligation to provide the CGM Output Data to UHS.

38.     DexCom has also repudiated the irrevocable, perpetual license it granted under Section 8.5 of the Product Purchase Agreement to UHS and Level2 to " ███████████████████████████████████████████████

███████████████████████████████████

**D.     DexCom's Repudiation Will Result in Substantial and Irreparable Harm to UHS**

39.     If DexCom blocks UHS's access to the DexCom API and/or imposes new legal or technological restrictions on the use of CGM Output Data after June 1, 2024, Level2 patients who use the G5 and G6 CGMs will face increased risks of adverse health consequences. This includes catastrophic risks, such as a patient losing consciousness or suffering a seizure while operating a motor vehicle or machinery.  This is especially true with respect to those Level2 patients that must have a DexCom G5 or G6 device (rather than an alternative product) because of the patient's insulin pump use, high Vitamin C levels, or because the patient works at a secured facility with limitations on cell phone use.  UHS understands that the DexCom G5 devices have been sunset and are no longer supported by DexCom. Thus, the DexCom G6 devices may be the only devices at issue in this dispute.

40.     Without access to DexCom's API and new legal and/or technological restrictions on the use of CGM Output Data, UHS will effectively lose the benefit of purchasing the DexCom's  G6 CGMs because Level2's healthcare professionals will have to resort to traditional methods of treatment (i.e., relying on patient self-

12

reporting).  UHS will also be unable to provide a DexCom GCM device to those Level2 patients who, as mentioned above, require such a device.  UHS will further be unable to utilize its approximately $500,000 in inventory of DexCom CGM devices.

41.    More specifically to UHS, if DexCom blocks UHS's access to the DexCom API or imposes new legal and/or technological restrictions on the use of CGM Output Data after June 1, 2024, Level2's ability to provide healthcare services to its patients will be disrupted, and its customers' and patients' trust in Level2 will erode.  The goodwill of UHS and its Level2 platform will be severely harmed.

## CAUSES OF ACTION

### COUNT I
### Anticipatory Breach of Contract (Delaware Law)

42.    UHS repeats and incorporates all allegations contained above as if each were fully set forth herein.

43.    The Product Purchase Agreement is a valid and enforceable contract.

44.    Under Section 8.5 of the Product Purchase Agreement, DexCom is ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

45.    Under Section 8.5 of the Product Purchase Agreement, DexCom has granted UHS and Level2 a perpetual, irrevocable license "█████████████████,

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████.″

46.     DexCom repudiated its obligations to UHS under Section 8.5 of the Product Purchase Agreement when, by letter dated April 30, 2024, DexCom positively and unconditionally informed UHS that its access to the API after June 1, 2024 is contingent upon UHS agreeing to conditions not contained in the Product Purchase Agreement.

47.     DexCom repudiated its obligations to UHS under Section 8.5 of the Product Purchase Agreement when, by letter dated April 30, 2024, DexCom positively and unconditionally informed UHS that, even if UHS agreed to the conditions, DexCom would only guarantee UHS's access to the API to September 30, 2024 and that such access, if not shut down earlier, would terminate on December 31, 2024.

48.     DexCom repudiated its obligations to UHS under Section 8.5 of the Product Purchase Agreement when, by letter dated April 30, 2024, DexCom positively and unconditionally informed UHS that DexCom intended to shut down UHS's access to the API without providing an alternative method by which DexCom would provide UHS with the CGM Output Data collected and

transmitted from Level2 patients' G5 and G6 CGMs "███████████████

████████████████████████████"

49.    DexCom repudiated the irrevocable, perpetual license it granted

under Section 8.5 of the Product Purchase Agreement to UHS and Level2 to,

among other rights, use, make derivative works of, disclose and distribute when,

by letter dated April 30, 2024, DexCom positively and unconditionally informed

UHS that DexCom has not granted UHS "███████████████████

█████████████████████████████████████████."

50.    DexCom repudiated the irrevocable, perpetual license it granted

under Section 8.5 of the Product Purchase Agreement to UHS and Level2 to,

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████."

51.    UHS sought assurances from DexCom that it would honor its

contractual obligations, but DexCom has refused to provide such assurances.

52.    DexCom has anticipatorily breached the Product Purchase

Agreement by repudiation.

53.     By contrast, UHS continues to fully perform its contractual obligations under the Product Purchase Agreement, including by paying DexCom more than $38 million pursuant to the terms of the Product Purchase Agreement over the last three and half years.

54.     UHS is entitled to an order of specific performance because DexCom's obligations under the Product Purchase Agreement are unique and cannot be replaced without UHS suffering irreparable harm.  UHS Level2's program is reliant on DexCom complying with its obligation to provide the CGM Output Data to UHS.  As previously stated, Level2 further has patients that require a DexCom G5 or G6 device rather than an alternative product.

55.     As an alternative to specific performance, UHS seeks damages for the harm DexCom has caused and will continue to cause to UHS.

## COUNT II
**Anticipatory Breach of the Implied Covenant
of Good Faith and Fair Dealing (Delaware Law)**

56.     UHS repeats and incorporates all allegations contained above as if each were fully set forth herein.

57.     The Product Purchase Agreement is a valid and enforceable contract.

58.     All contracts contain an implied covenant of good faith and fair dealing.

59.     Even if the parties' Product Purchase Agreement were construed to not grant UHS access to DexCom's API, the spirit of Section 8.5 requires DexCom to deliver the CGM Output Data to UHS without strings attached.

60.     The spirit of Section 8.5 further calls for DexCom to deliver the CGM Output Data to UHS for the duration that a DexCom CGM product is used in any UHS Program.

61.     If DexCom were to stop delivering the CGM Output Data to UHS or impose new legal and/or technological restrictions on the use of CGM Output Data, the entire reason for Level2 patients wearing DexCom devices is undermined, if not eliminated.

62.     Whether through the API or some other reasonable alternative, the spirit of the Product Purchase Agreement encompasses unconditional delivery of CGM Output Data.

63.     By unconditionally and positively repudiating its obligation to provide UHS with the CGM Output Data, as required by Section 8.5, DexCom has acted in bad faith, and has plainly violated the spirit of the Product Purchase Agreement, and anticipatorily breached the implied covenant of good faith and fair dealing contained therein.

64.     As a result of DexCom's anticipatory breach of the Product Purchase Agreement, UHS has incurred and will continue to incur harm, including direct and consequential damages, in an amount to be proven at trial.

## COUNT III
**Deceptive Trade Practices (Minnesota Law)**

65.     UHS repeats and incorporates all allegations contained above as if each were fully set forth herein.

66.     DexCom has knowingly and willfully committed unfair trade practices in violation of Minn. Stat. § 325D.44 by engaging in unfair methods of competition and unfair and unconscionable acts and practices.   DexCom's knowing and willful violations of Minn. Stat. § 325D.44 include, without limitation:

a.  Threatening to cut off UHS's access to the CGM Output Data unless UHS agrees to a set of conditions either not included in, or contradicted by, the Product Purchase Agreement; and

b.  Repudiating its obligation to provide CGM Output Data to UHS to gain leverage in their contract negotiations regarding adding DexCom's G7 CGM to the Product Purchase Agreement.

67.     DexCom has engaged in conduct that offends public policy as established by Minnesota law.

68.     DexCom has engaged in conduct that is unethical, oppressive and unscrupulous, and is substantially injurious to consumers.

69.     DexCom's unfair methods of competition and unfair and unconscionable acts and practices occurred in the course of its business.

70.     UHS is based in Minnesota and DexCom's unfair methods of competition and unfair and unconscionable acts and practices have been directed at UHS in Minnesota.

71.     UHS is entitled to injunctive relief prohibiting DexCom from repudiating its Section 8.5 obligations and preventing or letting lapse UHS's access to DexCom's API.

72.     Absent injunctive relief by this Court, UHS and Level2 patients will suffer irreparable injury and future harm.

73.     Pursuant to Minn. Stat. § 325D.45, UHS is entitled to recover its attorneys' fees because DexCom has willfully and knowingly engaged in deceptive trade practices.

WHEREFORE, UHS respectfully requests that the Court:

a. Enter temporary, preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 65 prohibiting DexCom from repudiating its Section 8.5 obligations, prohibiting DexCom from preventing or letting lapse UHS's access to DexCom's API,

prohibiting DexCom from conditioning UHS's use of that CGM data on new legal and technological restrictions, and prohibiting DexCom from breaching its Product Purchase Agreement with UHS.

b. Enter temporary, preliminary and permanent injunctive relief pursuant to Minn. Stat. § 325D.45 prohibiting DexCom from repudiating its Section 8.5 obligations, prohibiting DexCom from preventing or letting lapse UHS's access to DexCom's API, prohibiting DexCom from conditioning UHS's use of that CGM data on new legal and technological restrictions, and prohibiting DexCom from breaching its Product Purchase Agreement with UHS.

c. Enter an order of specific performance requiring DexCom to comply with its obligation to provide UHS with the CGM Output Data collected and transmitted from Level2 patients' G5 and G6 CGMs for the duration of the Products use in any UHS Program;

d. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that DexCom is required under Section 8.5 of the Product Purchase Agreement to provide UHS with the CGM Output Data collected

and transmitted from Level2 patients' G5 and G6 CGMs for the duration of the Products use in any UHS Program;

e.  Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that DexCom granted UHS an irrevocable, perpetual license " ███

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████ and DexCom is prohibited from imposing new legal or technological restrictions with respect to that license;

f.  Enter judgement in favor of UHS and against DexCom on Count I and Count II and award UHS actual and consequential damages, including attorneys' fees and expenses, in an amount to be proven at trial, plus interest and costs, and such other and further relief as this Court deems just and proper;

g.   Enter judgement in favor of UHS and against DexCom on Count III and award UHS attorneys' fees and costs, and all other monetary relief permitted by Minn. Stat. § 325D.45, and such other and further relief as this Court deems just and proper; and

h.  Grant such other and further relief as this Court deems just and proper.

### Jury Demand

UHS demands trial by jury on all Counts where trial by jury is available.


Dated: May 10, 2024                **ROBINS KAPLAN LLP**

By:  */s/ Jeffrey S. Gleason*
Jeffrey S. Gleason (Minnesota Bar No. 0396190)
Jamie R. Kurtz (Minnesota Bar No. 0391792)
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
(612) 349-8500
jkurtz@robinskaplan.com
jgleason@robinskaplan.com

*Attorneys for Plaintiff*
*United HealthCare Services, Inc.*